UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| COURTNEY DARR<br>    PLAINTIFF,<br>vs<br><br>MICHIGAN STATE UNIVERSITY,<br>MICHIGAN STATE UNIVERSITY<br>COLLEGE OF EDUCATION, DR. JANA<br>AUPPERLEE, SARA LEGGETT, DR.<br>RICHARD PRAWAT, DR. JOHN<br>CARLSON,<br>    DEFENDANT, | HON:<br><br>Case No.: |

Rebecca Kerr (P79487)
Callebs Law, PLLC
Attorney for Plaintiff
4125 Okemos Road, Suite 23
Okemos, MI 48864
517.345.7600
rebecca@callebslaw.com

## COMPLAINT AND JURY DEMAND

**NOW COMES,** Courtney Darr, by and through her attorney Rebecca Kerr and for her Complaint and Jury Demand against the above-named Defendants, states as follows:

### JURISDICTION

1. This case arose in the City of Lansing, Ingham County, Michigan; and under federal law, particularly, Equal Opportunity for Individual with Disabilities Title 42 of the US Code No.: 12101-12213 and the Rehabilitation Act of 1973, Title 29 of the US Code No.: 504;

2. This Court has jurisdiction of this cause under Title 28 of the United States Code No.: 1331 and 1367(a);

3. The Plaintiff resides in the City of Lansing, County of Ingham, State of Michigan;

4. Defendant's Michigan State University (MSU) is an institution of higher learning, established under the laws of the State of Michigan, with its principal campus in East Lansing, Michigan;

5. Defendant MSU College of Education is a college of Michigan State University conducting its business on the main campus of Michigan State University;

6. Defendant Dr. Jana Aupperlee is the Director for the School Psychology Department in the Department of Counselors, of Education Psychology and Special Education (CEPSE), College of Education, at Michigan State University;

7. Defendant Sara Leggett is Plaintiff's supervisor during Plaintiff's internship in Okemos Schools is a graduate of the MSU CEPSE program in School Psychology. Defendant Aupperlee was Defendant's Leggett's advisor in the program;

8. Defendant Dr. Richard Prawat is the former Department Chair of Counseling, School Psychology and Special Education, Michigan State University. Cary Roseth is the current Department Chair of Counseling, School Psychology and Special Education, Michigan State University;

9. Defendant Dr. John Carlson was Plaintiff's Advisor for the MSU Doctorate Program;

INTRODUCTION

10. In this action Plaintiff seeks declaratory and injunctive relief against Michigan State University and the Michigan State University College of Education requiring them to clear all the confusion regarding her dismissal from the School Psychology program and require MSU to reinstate the Plaintiff so she may complete the School Psychology program to obtain her PhD degree;

2

11. That Defendant Michigan State University pay compensatory damages to Plaintiff including deprivation of Plaintiff's property without due process of law;

## STATEMENT OF FACTS

12. On or about March 2014, Plaintiff's application for admission to the doctoral program in the Department of Counseling, Education Psychology and Special Education was granted. The assigned advisor to her was Dr. Carlson starting the fall of 2014;

13. During the Plaintiff's first and second years of the PhD program she received mostly positive feedback with class participation and oral presentation skills identified as areas for growth;

14. The Plaintiff's grade point average during the first two years was a 4.0;

15. On or about August of 2016 the Plaintiff started her third year of the PhD program;

16. During the third year of the PhD program the Plaintiff was required to complete a yearlong course (CEP 894K) and a 600 hours internship in the public K-12 schools;

17. Defendant Sara Leggett was assigned to be field supervisor for Plaintiff at Okemos Schools;

18. The Plaintiff noticed during the first few weeks of her internship that there was a mismatch between herself and Defendant Sara Leggett;

19. On the about October of 2016, Defendant Aupperlee conducted a meeting with the Plaintiff after she was sent the routine mid-semester feedback from Defendant Ms. Leggett;

20. It was as this point the Plaintiff raised concerns to Defendant Dr. Aupperlee about her fit with Defendant Leggett as her field supervisor. Dr. Aupperlee assured the Plaintiff that Ms. Leggett was "positive" and "things would likely work out";

21. On or about November 8, 2016, Plaintiff set up a supervision meeting with Defendant Leggett for a re-evaluation for special education which was scheduled on November 14, 2016;

22. To ensure this evaluation was moving along smoothly, the Plaintiff worked additional hours including on non-internship days;

23. Additionally, on November 10, 2016 – November 13, 2016, the Plaintiff was attending to personal family matters which were occurring on the other side of the country, due to a family member passing away unexpectedly;

24. On or about November 15, 2016, the Plaintiff had a meeting with Defendant Leggett, in which Defendant Leggett gave the Plaintiff a considerable amount of critical feedback;

25. The Defendant's critical feedback characterized the Plaintiff as "paralyzed" and included that she "wasn't doing enough";

26. It was at this point that the Plaintiff's eyes started to water, and Defendant Leggett responded by saying "Oh, I made you cry";

27. The Plaintiff explained to the Defendant she had this involuntary response due to the Plaintiff being "really jet lagged and tired from her trip";

28. Upon information and belief of the Plaintiff, Defendant Leggett contacted Defendant Dr. Aupperlee to inform her of the meeting that took place on or about November 15, 2016;

29. During the latter part of November 2016, the Plaintiff attended a meeting which was arranged byDefendants Dr. Aupperlee and Leggett;

30. It was during this meeting the Defendants Aupperlee and Leggett began discussing with the Plaintiff the events which occurred between the Plaintiff and Defendant Leggett at the November 15, 2016 meeting,

4

31. Both Defendants began probing the Plaintiff to learn why she had responded with watery eyes. Again, Plaintiff reiterated that she was exhausted with her work while attending to a funeral and family obligations across the country;

32. Despite repeated assurances by the Plaintiff that she was fine, Defendants Aupperlee and Legget continuously probed Plaintiff causing her to become increasingly uncomfortable;

33. Defendant Aupuperlee stated repeatedly that "many students in our program take antidepressants", and further suggested that the Plaintiff should "consider looking into SSRIs or similar medications";

34. It was at this time that the Plaintiff stated "I am fine and I don't think this conversation needs to continue";

35. After about an hour of this line of questioning and with the Plaintiff repeatedly informing the Defendants she was "fine"; the Plaintiff began to feel completely exasperated and embarrassed, until she finally felt no other option was available to her other than disclosing that she was already taking medication for a diagnosed anxiety disorder;

36. The Plaintiff then explained she becomes anxious in front of large groups, like during class or when presenting results at meetings. The Plaintiff then indicated additional support and encouragement would be appreciated;

37. The Plaintiff provided the Defendants with the following additional accommodations to better support her needs due to her anxiety disability:
    a. Reasonably prompt and direct feedback
    b. Attending to questions Plaintiff has
    c. Attending to Plaintiff's request to seek supervision
    d. Increase transparency about the nature of meetings

5

    e. Increase opportunities to let her process things in writing instead of verbally; specifically to be allowed to provide written responses to feedback

38. During the spring semester, December 2016 to April 2017, the Plaintiff continued to perceive discriminatory actions from Defendant Leggett and also felt she was expected to comply with "unrealistic and unhealthy work expectations";

39. The Plaintiff was participating with her internship on off days and spending too much time outside of school on fieldwork;

40. These extra responsibilities coupled with the increasingly negative responses from Defendants Aupperlee and Legget, resulted in Plaintiff receiving an assessment of her final portfolio subpar work product in April of 2017;

41. This assessment was in direct conflict with the positive feedback Plaintiff received on her portfolio draft in February 2017;

42. On or about May of 2017, the Plaintiff was notified she did not receive a passing grade due to her work product not being at program standards. Additionally, Plaintiff was notified she did not receive high marks on her performance evaluation;

43. The Plaintiff attempted throughout the term to address her concerns to the Defendants regarding the extent of her fieldwork and that it was interfering with other responsibilities as she was required to put in more time in the field than her classmates, but her concerns were disregarded;

44. The Plaintiff was assigned to complete nine evaluations during the 2016-2017 school year while most members of the Plaintiff's cohort were required to only complete three or four evaluations during the same time period;

45. The Plaintiff received feedback from both Defendants Aupperlee and Leggett that the Plaintiff is "rigid" and "inflexible";

46. The Plaintiff noticed during class time when discussions of internship experiences were shared, other students were allowed to speak freely, but Plaintiff was frequently interrupted by Defendant Aupperlee;

47. The Plaintiff met with Defendant Leggett to review and clarify Defendant Legget's feedback provided to the Plaintiff in the form of an evaluation;

48. It was at this point when the Plaintiff stated "I wish that this feedback could have been given to me directly. It made me really uncomfortable this year that feedback tended to go to Dr. Aupperlee before it came to me. I don't know how else I could have addressed your concerns or remind you that I had actually done things that you said I didn't do."

49. Defendant Leggett's response to the Plaintiff was "Oh, I didn't know what to do because of your anxiety.";

50. On or about June 11, 2017, the Plaintiff provided Defendant Aupperlee her written concerns of the discriminatory behaviors of Defendant Leggett, and Dr. Aupperlee agreed that Plaintiff and Defendant Aupperlee should meet with Ms. Leggett;

51. At no time did Defendant Aupperlee address Plaintiff's concerns or allegations of discriminatory behaviors or acts based on her anxiety disclosure;

52. In fact, Dr. Aupperlee informed the Plaintiff that she "would like to work with [Plaintiff] on handling critical feedback";

53. Defendant Aupperlee further supported Defendant Leggett's low ratings of the Plaintiff's professional behavior by telling her "Rebecca [Plaintiff's 2nd year field supervisor] did

7

not know that you had a boyfriend until April last year; it's like she didn't even know you.";

54. On or about August 23, 2017, the Plaintiff met with the program faculty at a Retention Review Meeting. It was at this meeting that the Plaintiff was informed she would need to retake two semesters of CEP 894K and the accompanying school-based internship, despite the fact that Plaintiff received a passing grade in CEP 894K in the fall of 2016;

55. At the Retention Review meeting Defendant Aupperlee stated "I see Courtney as a 4.0 student with an occasional 3.5";

56. Plaintiff was notified at this time that she would be placed on probation for Fall of 2017;

57. On or about October 31, 2017, the Plaintiff met with Defendant Dr. Aupperlee to discuss her progress. Dr. Aupperlee informed the Plaintiff she was doing a great job and was addressing areas of concern;

58. On or about November 21, 2017, the Plaintiff was asked to meet with Drs Aupperlee and Carlson regarding her performance and to discuss mid-semester evaluation of her performance by her field supervisor;

59. During the meeting the Plaintiff was given negative feedback about her overall semester performance which contradicted the feedback she received on October 31, 2017 from Dr. Aupperlee;

60. The Plaintiff was asked to verbally discuss each of her probationary checkpoints and share if she thought she was meeting each standard;

61. The Plaintiff reflected on her areas of growth and areas in which she was still working to improve upon;

62. Despite success with her new internship placement and new field supervisor, the Plaintiff was criticized and badgered by Drs Aupperlee and Carlson until forced to concede that she was not meeting their expectations for each checkpoint;

63. Defendant Aupperlee's criticism went as far as telling the Plaintiff "you should discuss your probationary checkpoints with your therapist"; furthermore, Defendant Carlson stated that the meeting was "punitive in nature" and "we are looking at whether to keep you or not";

64. On or about January 8, 2018, the Plaintiff met with Dr. Aupperlee and two other faculty members, where Plaintiff was summarily dismissed from the program and subsequently terminated from her teaching assistantship;

65. During this meeting the Plaintiff informed Dr. Aupperlee and the two-faculty members that she had registered with MSU Resource Center for Persons with Disabilities (RCPD) in December to receive accommodations;

66. At this time, Dr. Aupperlee stated to the Plaintiff "the accommodations would not make a difference but I'm glad you recognize that you need help."

67. Plaintiff did not receive a reason for her dismissal until late January 2018, wherein the Defendants merely cited the MSU School Psychology Handbook;

68. On or about January 23, 2018, the Plaintiff received her Verified Individualized Services and Accommodations (VISA) from RCPD;

69. On or about February 23, 2018, the Plaintiff sent a request for an appeal hearing to the MSU Department Chair of Counseling, Educational Psychology, and Special Education, Dr. Richard Prawat;

70. Plaintiff contacted the Office of Institutional Equality (OIE) and attempted an informal resolution. Plaintiff attempted the following informal resolutions:
    a. Filed a Complaint
    b. Granted Option to Propose an informal resolution
    c. OIE found resolution proposal was reasonable
    d. Defendant Aupperlee rejected proposal
    e. Formal investigation has been closed as of April 26, 2019;
71. Dr. Richard Prawat did not forward the Plaintiff's hearing request onto the Chair of the hearing board until April 4, 2018, which is a direct violation of MSU Graduate Student Rights and Responsibilities (GSRR) 5.4.3 (Exhibit A);
72. Plaintiff was notified that the CEPSE grievance was forwarded to Dean of the College on or about April 4, 2018. Additionally, Plaintiff received a few emails about scheduling from College of Education hearing board chair throughout the month;
73. On or about May 8, 2018, the College of Education hearing was conducted;
74. On or about May 11, 2018, Plaintiff was notified that her request was denied;
75. On or about May 18, 2018, Plaintiff submitted an appeal request to the University Graduate Judiciary (UGJ) (Exhibit B);
76. On or about June 5, 2018 the UGJ appeal meeting was held; however, the meeting was held by the committee and did not involve the Parties. At this same time Plaintiff was notified that her discrimination concerns were "not in their jurisdiction";
77. After exhausting all of her procedural options with MSU, Plaintiff was forced to move forward with this Complaint;
78. On or about April 25, 2019, Plaintiff received the final report from OIE;

# COUNT I
## DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

79. Plaintiff refers to and incorporate herein by reference all the preceding paragraphs as though fully restated;

80. The ADA broadly protects the rights of individuals with disabilities with respect to employment, access to State and local governments services, places of public accommodations, transportation, and other important areas of American Life;

81. Pursuant to 42 USC 12102(A) & (C), an individual is disabled when the individual has "a physical or mental impairment that substantially limits one or more major life activities" and if the individual is being regarded as having such an impairment (as described in paragraph 3). The Plaintiff was at all times relevant herein a qualified individual with a disability as therein defined;

82. Pursuant to 42 USC 12102(3)(A), an individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. The Plaintiff's actual impairment is anxiety disorder and was diagnosed years ago when she was in high school; furthermore, the Plaintiff's disability was perceived as a mental impairment many times by the Defendants which limited at least three major life activities;

83. Pursuant to 42 USC 12102 (2)(A), major life activities include, but are not limited to, caring for oneself, preforming manual tasks, seeing, hearing, eating, sleeping, walking,

11

standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communication and working. The Plaintiff's mental impairment limited major life activities as her anxiety affects her ability to learn, communicate, and concentrate;

84. The Plaintiff is entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990, amended in 2008. Title II, Subpart A prohibits discrimination by any "public entity" including any state or local government, as defined by 42 USC 12131;

85. Pursuant to 42 USC 12132, no qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. The Plaintiff was at all relevant times herein a qualified individual with a disability as therein defined;

86. Pursuant to 42 USC 12182(a) no individual shall be discriminated against on the basis of disabilities in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accommodation by any person who owns, leases, (or leases to), or operates a place of public accommodation. The Plaintiff was discriminated against due to her disability and was denied full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations;

87. Pursuant to 42 USC 12181(7)(j) MSU is considered a "place of education";

88. Pursuant to 42 USC 12181(2)(A)(i)(ii)(iii), discrimination includes:

    i. The imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services,

      facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, accommodations being offered;

  ii. A failure to make reasonable modification in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privilege, advantages, or accommodations.

  iii. A failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

89. MSU has failed in its responsibilities under Title II and III to provide its services, programs, and activities in a full and equal manner to disabled persons as described hereinabove, including failing to ensure that educational services are provided on an equal basis to individuals with disabilities and provided free from hostility toward their disability;

90. MSU and the Defendant employees of the institution were under an obligation to refrain from creating and maintaining a deliberately hostile and intimidating school and/or work environment for the Plaintiff based on her disability;

91. MSU has further failed in its responsibilities under Title II and III to provide its services, programs, and activities in a full and equal manner to disabled persons as described hereinabove by maintaining a severe and pervasive disability-based, hostile, and intimidating environment for the Plaintiff;

92. As a result of MSU's failure to comply with its duty under Title II and III the Plaintiff has suffered damages including special and general damages according to proof;

## COUNT II
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

93. Plaintiff refers to, and incorporates herein by reference, all the preceding paragraphs as though fully restated;

94. Upon information and belief, Plaintiff alleges that MSU has been at all relevant times the recipient of federal financial assistance, and that part of the financial assistance has been used to fund the operations, construction and/or maintenance of the specific public facilities described herein and the activities that take place therein;

95. By the Defendant's actions or inactions in denying equal access to educational services and by subjecting the Plaintiff to a hostile educational environment, the Defendants have violated her rights under §504 of the Rehabilitation Act of 1973, 29 USC 794, and the regulations promulgated thereunder;

96. As a result of MSU's failure to comply with its duty under §504 of the Rehabilitation Act of 1973, 29 USC 794, and the regulations promulgated thereunder, the Plaintiff has suffered damages including special and general damages according to proof;

## COUNT III
## VIOLATION OF THE MICHIGAN
## PERSONS WITH DISABILITES CIVIL RIGHTS ACT

97. Plaintiff refers to, and incorporates herein by reference, all the preceding paragraphs as though fully restated;

98. The Persons with Disabilities Civil Rights Act provides a guarantee as a civil right that persons have the opportunity to obtain "…full and equal utilization of public accommodation, public services, and education facilities without discrimination because of a disability." MCL 37.1102(1);

99. The Persons with Disabilities Civil Rights Act provides except as otherwise provided in article 2, a person shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship. MCL 37.1102(2);

100. Pursuant to MCL 37.1301(a), a "Place of public accommodation" means a …educational institution…whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public";

101. The Persons with Disabilities Civil Rights Act prohibits the den[ial]of an individual [to] the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodation of a place of public accommodation or public service because of a

disability, that is unrelated to the individuals ability to utilize and benefit from the goods, services, facilities, privileges, advantage, or accommodations or because of the use by an individual of adaptive devices or aids, MCL 37.1302(a);

102. Pursuant to MCL 37.1401 of the Persons with Disabilities Civil Rights Act, "Educational institution" means a public or private institution or a separate school or department of a public or private institution, includes an academy, college, elementary or secondary school, extension course, kindergarten, nursey, school system, school district, or university and a business, nursing, professional, secretarial, technical, or vocational school, and includes an agent of an educational institution.; and

103. The Persons with Disabilities Civil Rights Act prohibits:

　　a. Discriminat[ion] in any matter in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution or its services, or because of the use by an individual of adaptive devices or aids;

　　b. Further, Educational Institutions may not: [e]xclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual reenrolled as a student in the terms, conditions, and privileges of the institution, because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution, or because of the use by an individual of adaptive devices or aids. MCL 37.1402(a)(b)

WHEREFORE, Plaintiff prays for judgment as follows:

A. Injunctive Order requesting MSU to stop discriminatory practices within the CEPSE based on students with disabilities;

B. Issue declaratory relief ordering Defendant Michigan State University to reinstate Plaintiff's enrollment in the MSU School Psychology Doctoral Program;

C. Compensatory damages to Plaintiff for injury, emotional distress;

D. Punitive damages against Defendants MSU, College of Education, Drs. Aupperlee, Prawat, Carlson and Ms. Leggett;

E. Attorney's fees and Costs; and

F. Such other and further relief as the Court deems just and proper.

Respectfully submitted

Dated: May 6, 2019

By: /s/ Rebecca Kerr P79487
Rebecca Kerr (P79487)
Callebs Law, PLLC
Attorney for Plaintiff
4125 Okemos Road, Suite 23
Okemos, MI 48864
517.345.7600
rebecca@callebslaw.com

**I DECLARE THAT THIS COMPLAINT HAS BEEN EXAMINED BY ME AND THAT ITS CONTENTS ARE TRUE TO THE BESTOF MY INROMATION, KNOWLEDGE, AND BELIEF.**

| Dated: May 2, 2019 | *Courtney* [signature]<br>Courtney Darr |
|---|---|